UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Robert Arias,
        Plaintiff

        v.                                    Case No. 17-cv-516-SM
                                              Opinion No. 2021 DNH 011

Michael Bernard; Noah Herzon;
Ty Kucharski; Christopher Day;
Adalberto Garcia; and Juan Infante,
        Defendants

**O R D E R**


        On September 8, 2016, Robert Arias was arrested in an

operation that involved the six named defendants, as well as

about a dozen other federal law enforcement officers.  He claims

the arresting officers used excessive force against him (count

1) and says those officers who witnessed his violent arrest

failed to protect him from the excessive force used by others

(count 2).  He seeks monetary damages for physical and emotional

injuries he claims to have suffered.  See generally Bivens v.

Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S.

388 (1971).[1]

--------------------------------

[1]     Although several of the named defendants are police
officers employed by the cities of Nashua and Manchester, New
Hampshire, they appear to have been "detailed" to work on a
federal drug interdiction task force.  Accordingly, the parties
have assumed that, for purposes of this suit, all defendants are

Defendants move for summary judgment, asserting that there are no genuinely disputed material facts and saying they are entitled to judgment as a matter of law.  Alternatively, they say they are entitled to the protections afforded by qualified immunity.  For the reasons discussed, that motion is granted as to two defendants, but denied as to all remaining defendants.

## Standard of Review

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted).

---

properly treated as federal agents.  See generally 5 U.S.C. §§ 3374(a)(2) and (c)(2).

**Background**

During the summer of 2016, members of the High Intensive Drug Trafficking Area Task Force ("HIDTA"), with the assistance of an undercover Drug Enforcement Administration operative, made several controlled purchases of fentanyl-laced heroin from the plaintiff, Robert Arias.

On September 8, 2016, the six named defendants, along with 10 to 15 other law enforcement officers, were assigned to aid in Arias's arrest at the Rockingham Mall, in Salem, New Hampshire. As Arias approached the mall, the decision was made to arrest him in the parking area, before he could exit his vehicle.  The car was driven by Arias's wife, Carmen Jose.  Arias was seated in the front passenger seat.  Once Ms. Jose pulled into a parking spot, several law enforcement vehicles blocked the car in.  Jose briefly tried to back up, but realized she was unable to do so.  She then put the car in park, as numerous officers, many in plain clothes and with weapons drawn, surrounded the vehicle.

All agree that Arias and Jose complied with the officers' commands and did not resist.  Jose was removed from the vehicle without incident.  As officers attempted to remove Arias from the vehicle, they quickly realized they could not do so because

he was wearing a seatbelt.  One of the officers then cut Arias's seatbelt and he was dragged from the car, taken to the ground, and handcuffed.  According to the defendants (some of whom actively participated in the arrest, while others merely observed it), the arrest was quick, routine, non-violent, and unremarkable.  Because Arias offered no resistance, all defendants join in saying that very little force was needed to extract him from the car, take him to the ground, secure his arms and legs, and restrain him in handcuffs.  In support of their view that Arias suffered no significant injuries, defendants point to Arias's booking photos, which do not appear to show any visible injuries to his face or head, and reveal only a small mark or abrasion on the right side of his neck. See Declaration of Michael Bernard, Exhibit 1 (document no. 43-3) at 10-15.

Arias and his wife tell a markedly different story.  They agree that Arias offered no resistance and complied with the officers' commands.  But, they say the officers used excessive force in extracting Arias from the vehicle, taking him to the ground, and restraining him on the ground.  According to Arias's sworn testimony:

When we arrived in the parking lot and stopped, two men, in plain clothes approached the car and had guns drawn.

As they approached the car, I put my hands up.  The windows of the car were not tinted, so the men approaching the car could see that I was putting up my hands.

I did nothing throughout the Arrest to resist being arrested.

The two men pulled me from the car, mainly by my neck. It was done very forcibly.  At the same time, they cut my seatbelt with a knife and threw me to the ground.

I then noticed that there were many men/officers around me, the majority were in plain clothes and many had their guns drawn.  They were yelling something like "don't move."

I was yelling at Carmen, who was pregnant at the time, to "leave" in Spanish.  I was worried about her and her pregnancy.

After I was on the ground, there were approximately 7 men/officers on top of me.  I was not resisting arrest at all.  They were mainly on top of my legs and it hurt my knee.  There was an intense pressure on my leg that caused me to scream in pain.

The men/officers again banged my head to the ground, mainly the right side of my head.

I don't remember where they touched me, I just have an intense memory of the pain in my leg.

I lost consciousness and was so afraid that I urinated in my pants.

Again, I was not resisting arrest at all, just yelling out in pain and trying to protect Carmen by not having her see what was happening.  I may have been moving because of the pain that they were causing.

They put handcuffs on me after I was on the ground.

> After the handcuffs were on me, the men/officers
> stepped on me, on my left leg, while I was on the
> ground. I think it was not necessary as I was already
> in handcuffs.  They did this multiple times.

Affidavit of Robert Arias (document no. 48-2), at paras. 7-19.

See also Arias's Answers to Interrogatories (document no. 43-10)

at 3 ("Two agents came out [and] my wife put the car in reverse.

The two Agents who exited Macy's ordered us to stop the car.  My

wife then came to a complete stop and put the car in park.  One

of the Agents then opened the passenger door, [and they]

identified themselves as 'DEA Agents.'  One of the Agents used

excessive force to take me out [of] the vehicle, by pulling me

out by [my] neck when my seatbelt was still on.  One of the

Agents then cut off my seatbelt.  They slammed me to the ground

[and] several more Agents came.  The[n] one of the Agents cut

off my waist belt on my pants.  I pissed my pants out of fear

for my life as the Agents continuously assaulted me.  I thought

my life was over.").


    Arias's wife, Carmen Jose, recounts a similar version of

the relevant events and describes the arresting officers as

having used more force against Arias than was objectively

reasonable under the circumstances.[2]

---

[2]    See generally Graham v. Connor, 490 U.S. 386, 397 (1989)
(noting that the inquiry into whether law enforcement officers

I am the wife of Robert Arias, who was arrested on September 8, 2016 ("Arrest") and filed a complaint against the U.S. Government on or about October 2017 (17-CV-516-SM) ("Lawsuit") related to his Arrest.  I have not seen the Complaint, but my husband has spoken of it to me.

My husband, Robert, does not speak or understand English.  He came to the United States from the Dominican Republic in 2015.

I was present on September 8, 2016 when Robert was arrested in the parking lot of the Rockingham Mall in Salem, New Hampshire.

At the time of the Arrest, I was 3 months pregnant and it was a delicate pregnancy because of my health.

I drove up to the Rockingham Mall parking lot, and Robert was in the passenger seat.  Some suspicious men approached the car.  Then a vehicle blocked in our car.  I was in the driver's seat at the time and Robert was in the passenger seat.

As the men/officers approached me, I told them that I was pregnant and not to touch me.

I saw much of what happened to Robert before I was led away by a man/officer to a car with tinted windows.

At no time during the Arrest did Robert or I resist being arrested.  We were both very concerned about my pregnancy.

I saw the men (who were not in uniform) approach our car with guns drawn.  They forcibly grabbed Robert out of the car and cut the seatbelt.  In addition, they cut the belt to his pants.

---

employed excessive force in the context of an arrest or investigatory stop is an objective one, focused on whether the officers' conduct was "objectively reasonable in light of the facts and circumstances confronting them.")

I saw them punch Robert on the face when they took him out of the car.  They used a choke hold to get Robert out of the car and then slam him to the ground.

When they slammed Robert to the ground, I believe he hit his head because he screamed.

I remember saying "What are you guys doing?" as I could not believe why they were using such force on Robert.

I remember Robert saying to me "Tell them not to hurt me like that" in Spanish.

At this point there were many, many men around, enough to fill a chapel.  Most of them were in regular clothes, not police uniforms.

I saw that many men/officers were on top of Robert and started to step on Robert's leg and stomach.  At one point, I saw at least 5 men/officers, who were on top of Robert, mainly on his leg and knee.

At this point they also started kicking Robert, mainly in the ribs and I believe it was on the right side.

I saw them pick up Robert and slam him to the ground.

They used such force with Robert that he urinated on himself.

Throughout this whole time, the officers kept their guns drawn even though neither Robert nor I were resisting arrest at all.  Our main focus was on my pregnancy.  Some of the men/officers put their guns away when Robert was on the ground.

Throughout the Arrest, Robert was screaming at me to "leave" in Spanish as he was concerned about the pregnancy.  I believe that Robert was concerned that watching him getting beat up would cause me distress and could affect the pregnancy.

I addition, I remember Robert screaming in pain at times and shouting "my knee, my knee" a number of times.  It was very distressing to hear Robert in such

pain and not be able to do anything.  Robert does not
speak English, so all these words were in Spanish.

* * *

I saw Robert again that evening at the County jail.
His face was swollen (his eye and lips on the right
side) and he had dark marks.  In addition, he showed
me his knee which was swollen.  He complained of the
hurt.  The swollenness seemed to be getting worse with
time.

Affidavit of Carmen Jose (document no. 48-3) at paras. 2-22, 25.


Corroborating the accounts of Arias and Jose are medical

records showing that Arias sought treatment (in the jail) in

November of 2016 for an injury to his knee.  Subsequently, in

March of 2017, he saw the jail's nurse, who reported that Arias

said he was unable to bend his left knee.  Strafford County

House of Corrections Medical Records (document no. 51-2) at 10.

Three days later, X-rays of Arias's left hip and left knee were

ordered "due to chronic pain."  Id.  The physician's assistant

reported, "Assessment: Chronic hip and knee pain over the last

six months. . ..  I suspect patient has significant degenerative

changes.  Likely will need orthopedic management."  Id.


Jail records reveal that Arias again complained of "hip and

knee pain" in September of 2017.  Id. at 9 ("Seen in unit for ss

c/o hip pain.  CO used as interpreter.  IM states he was seen at

seacoast ortho about 5 months ago and was given a shot for the pain.  It helped for a few days but then the pain returned.").  That same day, Arias was seen by a physician, who prescribed Ibuprofen, 800 mg, twice a day for 90 days.  In June of 2018, Arias was again seen for "chronic hip and knee pain" and the nurse noted "marked [osteoarthritis] L knee; mild OA L hip." Id. at 7.

More recently, in January of 2019, and again in March of 2019, Arias was seen by jail staff for complaints of chronic pain in his left knee and hip.  One medical note states that a physician reviewed Arias's medical records and entered the following order: "OK to MRI left hip to 'assess lateral hip for chronic bursitis changes and possible gluteal tear.'"  Id. at 5. Another note suggests that Arias was directed to have an "outside consult" with an orthopedic specialist.  Id.

### Discussion

Two defendants – Juan Infante and Adalberto Garcia – move for summary judgment on grounds that they were not present for, nor did they even witness, Arias's arrest.  Rather, those officers have testified that they remained inside the Rockingham Mall during the entire course of that arrest.  See Affidavit of Juan Infante (document no. 43-6); Affidavit of Adalberto Garcia

(document no. 43-7).  Arias does not dispute those statements.
Although his complaint identifies those officers as having
participated in his arrest, his subsequent answers to
interrogatories reveal that he cannot identify Infante or Garcia
as having been in the group who allegedly assaulted him (or who
allegedly stood by while he was being assaulted).  <u>See</u> Answer to
Interrogatory No. 2 (document no. 43-10) at 4.  <u>See generally</u>
<u>Gray v. Cummings</u>, 917 F.3d 1, 5-6 (1st Cir. 2019) (collecting
cases and discussing the situation in which a plaintiff has
little or no memory of the events underpinning his or her
claims).

     Because there is no evidence that Infante or Garcia
participated in or witnessed Arias's arrest (and there is sworn
testimony that they did not), defendants Infante and Garcia
cannot be held liable for using excessive force or for failing
to intervene and stop other officers who were allegedly using
excessive force.

     Each of the remaining defendants, however, either actively
participated in Arias's arrest, or was present for and
witnessed, his arrest.  As to those defendants, it is plain that
there are genuinely disputed material facts that preclude entry
of judgment as a matter of law in their favor.  If a jury were

to credit the accounts of Arias and his wife, it could plausibly
find for Arias on one or more of his Bivens claims against those
remaining defendants – that is, a jury could sustainably
conclude that one or more defendants violated Arias's Fourth
Amendment rights by employing objectively unreasonable force to
take him into custody, and after he was in custody.

Finally, given the state of the factual record at this
juncture, the doctrine of qualified immunity affords defendants
no protection.  As presently developed, the record suggests
that: Arias had no history of violence; officers did not have
reason to suspect that he would react violently to their efforts
to take him into custody; officers had no reason to suspect that
Arias might be armed; Arias was not armed; Arias was being
arrested for a non-violent crime; and Arias cooperated
completely with the arresting officers and offered no
resistance.  Under such circumstances, the level of force used
against Arias – as alleged by Arias and his wife – would
obviously run afoul of the Fourth Amendment's reasonableness
requirement.  See, e.g., Raiche v. Pietroski, 623 F.3d 30, 39
(1st Cir. 2010) ("We need not decide whether there are
materially similar cases of controlling authority or a consensus
of persuasive authority existing at the time of the incident
which would have clearly established the law.  This is because

[the officer's] excessive conduct was such an obvious violation of the Fourth Amendment's general prohibition on unreasonable force that a reasonable officer would not have required prior case law on point to be on notice that his conduct was unlawful.") (citations and internal punctuation omitted).

### Conclusion

Defendants' motion for summary judgment (**document no. 43**) is granted in part and denied in part.  As to defendants Juan Infante and Adalberto Garcia, that motion is granted.  As to all remaining defendants, however, the existence of genuinely disputed material facts precludes judgment as a matter of law.  Their motion for summary judgment is, therefore, necessarily denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

January 19, 2021

cc:  Robert Arias, pro se
     Jeremy David Eggleton, Esq.
     Michael T. McCormack, AUSA

13